Chancellor Johnston
delivered the opinion of the court.
Perhaps my opinion will be better understood by a statement of some circumstances shewing the origin of this cause.
Charleston consists of two parts. The Southern, called the City, has been incorporated. The Northern, called the Neck, is'governed by the general laws of the State, modified in a few special instances.
The Neck includes Mazyckborough, Wraggsborough, Cannonbo-rough, &c. parcels which take their names from former owners of the soil.
The land in Wraggsborough originally belonged to John Wragg. On his death, it vested in his distributees ; and was afterwards laid out into town lots, intersected by streets, here called cross roads.
Among others, an oblong square, called Wragg-square, was laid out, having Meeting-street along the western end, and Charlotte-street along the southern side of it. Another street runs along its Northern side. East of it, lies a lot, now the site of the Second Presbyterian (or Flinn’s) church. It is alledged, by some, that a street intervenes between the church lot and Wragg-square ; others contend, that there is no such street, but that what is called a street, is, in fact, part of Wragg-square, itself. Which of these statements is corred, does not appear ; nor does it seem necessary to inquire.
The defendants, being the commissioners of roads for Charleston Neck, put up a railing, beginning at the church lot, and running by the lines of Charlotte-street, Meeting-street, and the street north of Wragg-square, back again to the church lot: so as to enclose Wragg-square, if it bounds on the church lot, and to include, with it, the street between the square and the church lot, if there be a street there. There are five Euglish gates, at intervals, along the railing.
For this, an indictment, containing two counts, was preferred against them. The first, alledges the existence of a street between the square and the church lot, and that the railing, obstructing it, is a public nuisance. The second count, is, also, for a public nuisance in enclosing' Wragg-square, whatever its extent be.
The cause was tried before Justice Evans, at May term, 1834, and the defendants were found guilty on the second count. There was no finding on the first.
*147 The circuit judge reports as follows :
“ It appeared, from the evidence, that that part of Charleston Neck, where the alledged offence was committed, formerly belonged to the heirs of John Wragg ; and was laid off, when divided, into lots and streets. On the plats, the spot was called Wragg-square. This square, it. was contended, had been dedicated, by the owners of the land, to the public use. There was no doubt it had been so dedicated.
“ The second count involved the questions, for what uses had the heirs of Wragg dedicated this square to the public 1 and, whether the commissioners had any right to enclose it 1
“The deed of partition, whereby this dedication was made, was lost or mislaid. To prove its contents, Mr. Manigault and Major Wragg, were examined, (particularly the latter,) who said it was the intention of the parties, of whom he was one, to convey it as an open square. He was not questioned, as to the intention of the parties, but as to the contents of the deed, and spoke of the intention of the parties, as evidence of what the deed contained.”
The defendants now move for a new trial; and'in support of their motion, file the following grounds :
1. That there was not sufficient evidence before the court, that the square, called Wragg-square, was public property ; so as to warrant an indictment for obstructing it.
“ Admitting it to be public property :
« 2. That his Honor erred, in charging the jury, that either Mr. Manigault, or Major Wragg’s evidence, was valid, as to their private understanding and intentions, in executing a deed to the public, in conjunction with the numerous other heirs — whereas, it is respectfully submitted, that all they could be legally admitted to prove, was, that such a deed had .existed — the loss of it, and the contents thereof —that the square had been conveyed as an ‘ open square/ to the public — but no more.
« 8. That the very fact of conveying to the public, (supposing it ever to. have been so conveyed,) as an ‘ open square/ authorized the commissioners, so long as they did not build on it, but kept it open for public use, to rail it in, as all such squares were proved to be generally done; inasmuch as it was in evidence, not only that it could not be rendered available for the purposes of a square, (as contra distinguished from a common,) to the public, without such railing ; but that it had been, previous to the erection of the said railing, and would, again, become, (should it be removed,) a public nuisance.
“ 4. That laúd, dedicated to the public, as a square, is in contempla, tion of law, a highway ; and the right of determining how it shall be used and laid out, as such, or railed in for the public good, is vested, by law, in the commissioners; and they are not indictable for any use to which they shall devote it, unless such use can be shewn to be inconsistent with the terms of the original grant, contrary to law, or a public nuisance ; neither of which, has been proved in the present case.
“ 5. That the light of opening or closing up public roads or highways, and of deciding on the propriety of so doing, is fully vested in *148 the commissioners, under the act 1810 ; and their decision, as to the mode of opening or closing such highways, or as to what manner they shall be used, is conclusive on the point.”
All these grounds apply to the verdict on the second count in the indietment; and to that I shall confine myself.
With respect to that ground, which excepts to the evidence, my own opinion, — and I speak only for myself, — is this: I suppose the witnesses, in speaking of the intent with which the instrument was executed, were understood to mean, that it expressed that intent, and were, therefore, in fact, testifying to the contents of the lost paper ; hut they did not say, what intent was expressed by the instrument. This, I think, they should have been required to do; the real inquiry being, not what intention the parties to the instrument entertained, but what they expressed in writing.
To come, now, to the other grounds :
The finding is, that the inclosing of Wragg-square, by the defendants, with a railing and gates, is a public nuisance. •
A nuisance consists, 1 think, in the omission or commission of an act, whereby others are annoyed, and their rights violated; more briefly, it is the unlawful annoyance of others. There must be an annoyance as well as a wrong done; otherwise every wrong would be a nuisance.
A violation of right must attend the annoyance, for if the law justifies the act, no one has a right to say that he is annoyed by it. I do not mean that a person keeping strictly within his own rights, may safely annoy another; for it is not lawful so to exercise our own rights, as to destroy those of others; but I mean, that if he annoys that other, in a matter to which he can lay no legal claim, the law will not regard it as an offence. I say this, not that it is necessary to the cage, but to prevent misconstruction.
The - istinction between a public and a private nuisance is, that the former invades the public, the latter private persons ; justice pu. nishes the former by criminal prosecution ; she redresses the injury arising from the latter, by action.
I will now inquire, whether the defendants havé been properly convicted of a public nuisance. I mean, does the evidence shew, that the defendants have unlawfully annoyed the public, in the en. joyment of their rights ?
Whether the act of the defendants violated the rights of the public, must depend on what those rights were.
I would observe here, that, in my opinion, it is perfectly immaterial, whether the public had a right to Wragg-square, itself, upon condi *149 tion of patting it to certain purposes, or only aright to use it for those purposes.
If they own the soil, they may punish a trespass on it.
But if they can punish a trespass on their property, does that go to say, that they are destitute of a remedy for a nuisance, disturbing them in the use of it; any more than a private landholder is restricted to an action of trespass, and may not proceed in case for the throwing insalubrious substances on his land 1
If the public own the soil, by a conditional tenure, and have not the means of punishing an unauthorized violation of the condition ; then either they may be subjected to a forfeiture of the property, for no fault of their own, at the mere caprice of any vicious or ignorant citizen, or even foreigner; or the grantor must be kept out of property, which he only parted from, upon conditions, of the violation of which he may be the daily spectator.
If the soil is in the Wraggs, and the use in the public, any remedy which the former may have against individuals, for acts, inconsistent with the uses, outstanding in the public, is no remedy at all for the public, nor protection to them in their uses; and if they have not a remedy of their own, then their rights are only such as individuals may choose to concede to them.
It has been suggested, however, that even if the public has a remedy for a violation of the uses they had in the land, indictment is not that remedy; as an evidence of which, it is said indictment will not lie for a malfeasance, oh a common. But the reason is very obvious: the right violated is in the commons, and the injury, is to them, and not to, the public. On the other hand, is any proceeding more common, or more undoubted, than indictment, for obstructing highways, when the use, and nothing else, is in the public ?
Allow me to ask, if indictment is not sustainable for such offences, what is the remedy 1 A mere intrusion cannot be an offence, — or lather there can be no instrusion, when the very essence of the right, is, that every one may enter; wherefore, I doubt the resolution in Gotha’s case. (Note.-The analogy upon which instrusion, was held to be an offence, does not appear to be founded. The king holds land in England, by a personal, or official, or corporate right, which excludes the subjects from entering. Here, as was held, in the Sa.xe Gotha case,' the seizing is in the whole body politic ; which makes every citizen an owner, and instead of excluding, gives him a right to enter. Mere entry is, therefore, no offence ; the offence is in trespassing, setting up exclusive claim, and ousting others.) The offence must consist in something done, after entering, or besides entering. If that act *150 consists in a tort to the land, it is a trespass. -But here, the case we have supposed, and to which we are arguing, is when the public does not own the land, but a mere incorporeal hereditament in it, which is untangible, and not the subject of trespass ; no trespass can be committed on it.
1 have, therefore, no objection to the finding, arising from the quality of the right which the public had in Wragg-square.
But the question arises, have the defendants violated that right, whatever it be, and that tG the annoyance of the public ? And this raises, again, the enquiry, to what particular uses, in the square, does the evidence shew the public entitled ? ■
According to the evidence, the square was dedicated for “ an open square.” What does that mean ? What is the use tobe made of an open square?
If there was evidence on the trial, to shew what is meant by.an open square, it has not been furnished to this court. It was the duty of the State to make out its case against the defendants ; this it has not done, unless it has shewn that the act of the defendants violated the public uses of the square ; and this it could not do, without shewing what the uses were ; but of this there was no evidence, so far as I can see. The defendants have therefore been convicted without evidence.
This is the ground, and the only ground, upon which I wish to be understood as relying, in opposition to the verdict. This I feel very sure is tenable. There are other view's which have struck me with force,
If, in the absence of evidence, we should be called upon to conclude what were the purposes of the dedication, I would resort t* two sources.
Although there is no evidence of what the uses were, there is convincing evidence of what they were not-; whatever uses were intended, it is clear the square was not dedicated for a highway. There seems to have been a general impression, at the trial, that if this square was dedicated as “ an open square,” that gave a right, to every citizen of access, at all points, on horseback, and with every description of carriage, as well as on foot, and to traverse it in every direction ; in short, that it was a common highway, in the most extensive sense ; and the defendants themselves, yielding to this as incontrovertible, have, in some ot their grounds, resorted to their official authority over highways, as a justification of their act. But there is one circumstance which, in my opinion, conclusively establishes that this piece of ground could not have been dedicated to any such purposes..
*151 On three sides of the square, and adjoining it, it is conceded that sertain slips of land were dedicated for streets or highways. Was the square itself, which these streets enclosed, dedicated to the same purposes ? Then why in the dedication, draw a distinction between the streets and the square? Why not declare the whole to be one street? Or if an open square means a highway, why not include the streets with the square, and declare them all one open square ?
Another source to which I would resort, would be known custom. In all the cities of this confederacy, the custom as to their public squares, is to enclose and plant them, leaving gates for the access of the citizens. Of this we have instances in the city square of Charleston, Washington and other squares in Philadelphia; the Park and Battery in New-York, and the common in Boston ; besides others. They afford air, prospect, and agreeable walks for the health and recreation of the citizens. These, unless there be contradictory evidence; I take to be the purposes of Wragg-square.
And here I might unhesitatingly concede, that as the square is not a highway, the defendants, as commissioners of roads, had no official right to interfere with it. They had no jurisdiction over any of the public property, but that specially confided to them by their commission. The Legislature might have extended their authority to it, or they might have created a separate commission for its regulation ; but hitherto they have not committed its superintendence to any officers whomsoever. The defendants must, therefore, answer for their act as for the'act of private persons.
But is it a public nuisance, for private persons to take a piece of ground, in an unincorporated town, dedicated to the public for air, prospect and walks, but as to which' the public have taken no order, and erect a railing around it, with gates so as to obstruct neither air nor prospect, or the access of individuals? • If the rights of the public in Wragg-square, are such as I have supposed, the defendants, so far from having deprived them of them, have helped them to them ; they have not annoyed them in the exercise of them; on the contrary, they have promoted their enjoyment of them.
The act of the defendants was neither inconsistent with the public rights; nor has the public been, nor can they, without a change of circumstances, be prejudiced by it.
It has been suggested, however, that the public only have a right to declare the points of access for the enjoyment of this property; that they have not done so ; and the defendants have done it without authority, and that therefore their act is unlawful.
*152 Does it follow that the act is a nuisance, merely because it is unauthorized ? Not unless attended with prejudice to those entitled to enjoy the uses of the square. It is damnum absque injuria.
The want of authority to do an act, does not make it unlawful. To be so, it must be a violation of some right.
The right of the public to regulate the means of enjoying the uses here is one thing ; the right to enjoy those ' uses is another. The defendants have violated neither. They have left the community the full enjoyment of Wragg-square, for all the purposes to which it was dedicated; and as the public have made no regulations, they have violated none, nor have they taken away their right to regulate.
I will put a case. Suppose the legislature had established no commissioners or police for highways, but that highways, nevertheless, existed. That a right would exist in the legislature to regulate them, is indubitable ; that it would be an offence for an individual to obstruct them, no one will doubt ; but would it be unlawful for him, without authority, to mend them 1 Would it be an offence for him to do any act on them, which did not destroy the use of them?
If the legislature had appointed commissioners to make regulations here, and the defendants had done an act inconsistent with the regulations, they might be punished for that, according to the nature of their offence. But here, no order could he disobeyed, simply because none ever existed.
If officers had been appointed for the purposes I have supposed, and the defendants had taken their functions into their hands, they might have-been punished for the usurpation. But that offence runs - very wide of a nuisance ; for I apprehend, as the law now stands, it would be no nuisance, for instauce, in a citizen to repair a public road.
The defendants have left the community access to the square, which is all they had a right to, in order to the enjoyment of the square itself. They have done more; they have actually prevented the introduction of nuisances upon the square. This does appear to me to put their act far beyond the pale of criminal offences.
But as I said before, I rest my opinion that a new trial should bo ordered, upon the ground that the rights of the public were not shewn by evidence. It might be that the dedication was of a square to be planted and enclosed entirely, and kept for air and prospect only, without any right of access; in which case the defendants have done less than they might lawfully have done.
J. H. Smith and Petigru, for the motion;
Smith, Attorney General, contra.
It is my opinion that the motion, to set the verdict aside, should be granted ; and that a new trial should be ordered.
J. JOHNSTON.
We concur,
HENRY W. D'ESAUSSURE,
JNO'. B. O’NEALL,
RICHARD GANTT,
J. S. RICHARDSON.
A. P. BUTLER,